Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

_____ Division

FILED BY ___ JAO ___ D.C.

*Jun 23, 2020*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

|  |  |  |
|---|---|---|
| Walter Rojas | ) | Case No. _____ |
| _Plaintiff(s)_ | ) | _(to be filled in by the Clerk's Office)_ |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) |  |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | Jury Trial: *(check one)* ☐ Yes ☐ No |
| *please write "see attached" in the space and attach an additional* | ) |  |
| *page with the full list of names.)* | ) |  |
| -v- | ) |  |
|  | ) |  |
| US Department of the Army | ) |  |
| Ryan D. McCarthy, Secretary | ) |  |
| _Defendant(s)_ | ) |  |
| *(Write the full name of each defendant who is being sued. If the* | ) |  |
| *names of all the defendants cannot fit in the space above, please* | ) |  |
| *write "see attached" in the space and attach an additional page* |  |  |
| *with the full list of names. Do not include addresses here.)* |  |  |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### (Non-Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | *Walter Rojas* |
| Address | *13920 SW 268th Street, Apt. 201* |
| | *Homestead          FL    33032* |
| | City                State        Zip Code |
| County | *Miami-Dade* |
| Telephone Number | *786-246-3232* |
| E-Mail Address | *waltercitorojas@yahoo.com* |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | *US Department of the Army* |
| Job or Title (if known) | *Ryan D. McCarthy, Secretary* |
| Address | *5845   21st Street, Bldg. 214 Room 129* |
| | *Fort Belvoir          VA      22060-5921* |
| | City                State        Zip Code |
| County | |
| Telephone Number | |
| E-Mail Address (if known) | |

☐ Individual capacity   ☐ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Address | |
| | City                State        Zip Code |
| County | |
| Telephone Number | |
| E-Mail Address (if known) | |

☐ Individual capacity   ☐ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

## III.   Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

*The events occured in the states of California, New Jersey, and Alabama.*

B.    What date and approximate time did the events giving rise to your claim(s) occur?

*From March 2011 to May 2012.*

C.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

*See Attachment*

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

**IV.    Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

psychological damages

**V.    Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

I request Defendant to pay me for all the years lost, psychological and moral damages, and be returned to work.

**VI.    Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.       For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:   06-23/2020

Signature of Plaintiff   Walter Rojas

Printed Name of Plaintiff   Walter Rojas

**B.       For Attorneys**

Date of signing:   _____

Signature of Attorney   _____

Printed Name of Attorney   _____

Bar Number   _____

Name of Law Firm   _____

Address   _____

| | City | State | Zip Code |
|---|---|---|---|

Telephone Number   _____

E-mail Address   _____

Attachment for III. Statement of Claim, C.

Honorable Judge:

With all due respect, I would like to share with you the violation of my civil rights I have suffered when working at Defense Language Institute Foreign Language Center (DLIFLC) between the period April 2011 to May 2012. My wife and I were hired to work in the same program, under the supervision of the same boss, Mr. Samir Sallam. Both my wife and I had received very good evaluations and feedback for our performance until Mr. Sallam started requesting sexual favors from my wife. My wife filed an EEO case in January 2012, and I became a protected witness in her case. Then, given the overwhelming discrimination and hostile work environment I was experiencing, I also filed an EEO case in April 2012. In May 2012, as reprisal, DLIFLC gave me a letter, informing me that my contract was not going to be extended for "lack of work" although the institution was internally and externally advertising the need to fill various positions for which I had also applied.

My case (EEOC No. 480-2013-00138X; Agency No. ARPOM12April01562) went to trial in April 2014, and a decision in favor of the defendant (DLIFLC) was given on September 28, 2018.

I appealed the case (Appeal No. 2019001281) and on January 14, 2020 the Office of Federal Operations informed me that I had the right to request and file a Civil Action.

Below, I am provided a summary of the events.

1. I started work on April 12, 2011. On my first day, I was greeted by another colleague, Ms. MacArthur who showed me around and explained a few things about the ProMES program and the institution. My supervisor, Mr. Samir Sallam, I met him a week later as he [Sallam] was on temporary duty (TDY).

2. During that first week, I also met other coworkers from other departments. Thus, when Mirtha Kaufman (the coordinator of Resident program) and Tristan Cajar (team leader of Distance Learning) found out that I had a Ph.D. in Spanish-American Language, Literature and Culture, asked me to help their programs and teach some courses to their students. I told them that I was happy to do that, but before they had to request permission to my supervisor. Thus, after Sallam's approval, I was given a schedule to teach in both programs, Resident and Distance Learning.

3. At Salam's arrival to the office, it did not take long to realize that Sallam was favoring the two Arabic team members (Tariq Khaitous and Dr. Aloussi) whom he would assign as team leaders and have us watched very close.

4. Things were going on pretty well: I was teaching in various programs, and the programs had expressed their content with my work both orally and in writing.

5. My wife joined the team the first week of June 2011. Mr. Sallam started constantly calling my wife to his office, and I realized that my wife became very stressed. Then, my wife started telling me that Mr. Sallam was sexually harassing her and that she was afraid of him. Thus, I told my wife that if Sallam was going to call her again to see him alone in his office, I was going to accompany her. When Sallam realized that, he changed his attitude. Sallam ordered the team leader not to allow my wife and me to leave the office, even if it were for using the restroom, without asking and getting permission; many times I wanted to use the restroom, but because the team leader would disappear and Sallam would

not answer my calls, I had to remain seated for hours and wait for permission. This is when I realized that Sallam started to police us, using the two Arabic coworkers and specifically he started bullying me constantly, not only in private but mostly in public when colleagues from our program and/or other programs would be present, such as when Dr. Ali Afshar, Dr. Ali Naqib, and Margarita from Distance Learning were present and Sallam -out of nowhere- would start yelling at me and scolding me for unknown reasons. If I dared asked what was going on, Sallam would burst at me, saying that I had no right to question his actions because he was my boss and he had the right to hire or fire me.

6. Then, one day, Prof. Veronique from the Resident program told me that her supervisor Mirtha Kaufman had told Veronique that Sallam had me punished to remain in the office and that they could not invite me to teach in their program. Therefore, I would be seating all day long and writing the books Sallam was asking me to write: the textbook to teach Spanish in an intensive course, a textbook on Latin-American culture, and another textbook on Costa Rican culture.

7. Then, in August 2011, I was sent on TDY with Tariq Khaitous to Ft. Dix, NJ. There, I had a very good mission. One day, a four-start general in company of Mr. Rob Miltersen came to observe my class. They were very impressed with my class. Also, at the end of the mission, the site coordinator, Mr. Jay Strack wrote a letter of appreciation to thank me for the work I have done and inform our DLI coordinator for TDYs in that area that he [Strack] wanted to have me back teaching at Fort Dix. Additionally, the students had written me letters thanking me for the great experience and knowledge they had gained. However, at my return to Monterey, CA, I found out that, Mr. Khaitous made up a story and told Sallam that my students were complaining about me. When I showed Sallam the thank you letters from students and site coordinator, he did not want to hear me, saying that he believed Khaitous.

8. On October 15, 2011, all ProMES team went TDY to Montgomery, AL. The next day, Sallam humiliated me in front of the hotel manager. With the excuse to introduce me and my wife to the manager, Sallam said "Look at this couple. They are Uliana and Walter. Uliana is my best teacher. The bad part is that she got married to this guy. I don't know where she found him. No, problem (said Sallam looking at Uliana) I will get back with you later and I will fix your problem." We politely listened, smiled, greeted and follow our path. I said nothing for courtesy because the Manager does not know me, but I saw that Mr. Sallam's behavior and comments were inappropriate because he was referring to my marriage.

9. On October 17, 2011, after work, the colleagues got to the hotel restaurant for dinner. After dinner, the group stayed longer around a glass of wine. At a given time, Mr. Sallam asked Eve (a contractor teacher) for a "culin." Then, Projestus (a contractor from Tanzania) asked me what is the "culin". I warned Projestus that one must be careful when using the word "culin" (the word used by Mr. Sallam) because a "culin" can be a little bit of wine into the bottom of a glass or "culin" refers also to the behind/bottom of the person and that is why in Spanish one should be careful when using this word. When Projestus understood the word, he said in English: "then, give me a *culon*" or a big drink of wine. All laughed and we kept talking as among peers. Projestus said that after this party and drinking, Mr. Sallam and the Latina contractor teachers continued the party in a private where Projestus was also invited and where he witnessed Sallamar interacting in very unprofessional and inappropriate way with the contractor women.

10. On Tuesday, November 1st, 2011, a few of the colleagues were having dinner. My wife Uliana was seating at a table talking to Olga, a Russian contractor instructor (her phone number is: 301-641-1357 or email: olga.kras@yahoo.com). I was at the next table with another group of colleagues when I saw Mr. Sallam going to the table where Uliana

2

and Olga were talking. I saw that Mr. Sallam was very close to my wife Uliana. I saw that Mr. Sallam passed his hand caressing Uliana's shoulders, hands and kept talking. Then, I saw that Sallam took Uliana's hand in his hand and immediately Sallam gave her a kiss on the head. Quickly after, I saw the anxiety in Uliana's face. I do not think that this is an Arabic culture, as they are very jealous with their wives.

11. On Saturday, November 16, at 3 p.m., Uliana met with Mr. Sallam in the elevator and seeing her, he asked, "Where is Walter?" Uliana replied, "He is in the room cooking." Then, Mr. Sallam said to her, "Yes, put him to work because this man doesn't do anything." In fact, I do not think that this had be Sallam's concern because this is my private life and Sallam had no right to get into my private relationship with my wife.

12. On Tuesday, October 25, at 9:30 a.m., Mr. Sallam invited Daniel Jimenez (who was coordinator of Spanish division) and me to a meeting. There, Sallam accused me that 4 students had complained about my teaching. Sallam was yelling at me and told me that I had to meet with his every day to show him my lesson plans and what I was teaching. Again, Sallam started intimidating me and saying that we were in economic recession, that the economy was bad, and if I did not do what he asked me, he had the power to hire and fire me. The next day, I went to see Mr. Rob Miltersen to see what I could do for the students who had complained about me, as Sallam had said. Miltersen said that there was no complaint, just 4 students had to be assigned to a different level. This issue was clarified a couple of days later, when Colonel Palmer, the site military coordinator sent an email stating that there were no complains, it was just that some student had not been properly assigned to their level, for which those students had been reassigned and classes had been restructured. There, I realized that none of my students were moved, but only students from the contractors' courses, and that I had nothing to do with Sallam's made up complaint against me. That reaffirmed the idea that Mr. Sallam had me on his target and was looking to find any excuse to harm me.

13. On Sunday, October 30th, I started seeing Sallam and turning into him my lesson plans, yet Sallam would just take them make me seat for 30 minutes in silence and then he would leave without giving any feedback. A few days later, Sallam said that he did not find it any longer necessary for me to turn into him my daily lesson plans.

14. As my wife and I were assigned to the same car and we did not have the same teaching schedule, many times my wife would remain alone in the building until late at night waiting for me to come from another side of the base. Therefore, I asked Mr. Miltersen permission for my wife to join me to the class while waiting for me to finish the course. Mr. Miltersen accepted. Yet, some time later, Sallam order that Uliana could not accompany me to the other building when I was teaching and that she had to wait for me in the office. Given that Sallam was constantly after my wife, Uliana was extremely worried to stay there alone. Ashamed with such treatment, my wife and I did not tell Miltersen about Sallam's prohibition.

15. On November 6, 2011, at 6 p.m., Mr. Sallam met with Uliana to tell her that he wanted to educate her so that she can advise me because I was going into a wrong direction and if so he would not renew my contract; and that she (Uliana) should "remember that the economy is bad and it is difficult to lose the job". Very concerned, Uliana told me what Mr. Sallam told her, but that she did not know what to answer. Both Uliana and I knew that this was Mr. Sallam's judgment to not renew our contracts. This type of labor terror did not surprise me because Mr. Sallam did that in other occasions too (as it happened on October 30 in the lobby of the hotel) when he commented to me that the situation of the economy was difficult and if I lose the job it will be tough to find another one. After the meeting Sayed Pacha (our ProMES colleague) concerned, came to ask me what I was doing all that time with the boss.

16. Overwhelmed with Sallam's constant harassment (listening behind our room door) and discrimination, my wife and I asked to be given the opportunity to move to another hotel, yet on Sunday, November 6, Sallam called the team leader Nathalie MacArthur and told her that we were prohibited to move from the hotel, although Li Zang, another colleague of ours was stay at the base hotel.

17. On Thursday, November 3, at 9:15 am, Sallam called for a meeting. In the meeting, Sallam prohibited the team to leave the hotel without his authorization even if it was after work hours. Then, Sallam directly attacked my wife and me, alleging that I had used the word "culin" and that my wife and I were not team players because we did not spend after work time with others. Uliana tried to intervene, but Sallam started yelling at her and mocking on her, for which Uliana started crying, and Sallam was yelling even more and accusing me that I made Uliana cry. Colleagues tried to intervene, but Sallam started yelling at them, too. That was one of the most humiliating moments.

18. On October 28, 2011, at 6:30 pm, Said Pacha, my coworker came to tell me that Sallam called Pacha to tell him that he [Sallam] was not going to renew my contract, that he did not like Costa Rica people, that all Costa Rica people have fake degrees, and that he [Sallam] was looking for excuses not to renew my contract.

19. On another occasion, before going to bed, my wife and I decide to take out trash. When we got downstairs, Sallam was watching some colleagues belly dancing for him. When Sallam saw my wife, he ordered her to dance for him. My wife started shaking, and I took her away to avoid any unpleasant situation.

20. About a week later, while my wife was seating at the cafeteria table with Mina, Pacha's wife, Sallam called Pacha's wife and told her that my wife, Uliana was his princess and he [Sallam] was in love with her.

21. We returned to Monterey in December, yet Sallam continued with his constant attacks. On January 3, 2012, when I arrived at work, I found a CD on my desk with a note "It will help you." The CD had recorded all the November meeting when Sallam yelled at me and my wife. A copy of the CD and a transcription can be provided upon request.

22. Later on, that same morning, January 3rd, 2012, Sallam called me in and handed me a 10-day notice of termination.

23. On January 12, 2012, I met with the Provost, Dr. Fischer who reversed the termination letter and initiated investigation on Mr. Sallam for sexual harassment, discrimination, and hostile work environment. The internal investigation was carried by Dr. Thomas Perry. The report of the investigation was given on May 16, 2020 (ten days after my final labor termination) where Sallam is found guilty and removed from the position of administrator and transferred to instructor.

24. On January 12, 2012 at my and my wife's reveal of Sallam's conduct, ProMES program is closed and its members transferred to other DLI programs.

25. On January 13, 2012, I am transferred to Residence Program under the supervision of Mirtha Kaufman. As Kaufman and I already knew each other, Kaufman asks me what had happened, and my wife told her about the sexual harassment, discrimination, retaliation, and hostile work environment we lived under Sallam.

26. On February 18, 2012, my wife opens an official EEO case based on Sexual Harassment and discrimination of National Origin, and I am offered as key witness.

27. On March 6, 2012, Ms. Kaufman makes up the excuse, alleging that my spouse is doing the work for him.

28. On March 12, 2012, Ms. Sahie Kang (dean of Resident program) tells me that she was asked by Dr. Thomas Perry to inform me that I had to meet with Dr. Perry to make a declaration for my wife's spouse Sexual Harassment investigation.

4

29. Soon after, as a form of retaliation, Ms. Kaufman assigns Ms. Valoree Batista-Mason to observe my classes.

30. On March 23, 2012, Ms. Kaufman gives me a letter of Mid-point Review where she plagiarizes Sallam's letter of Termination.

31. On April 3rd, 2012, I answer in writing to Ms. Kaufman's Letter of Mid-point Review. When I take the rebuttal letter to Ms. Kaufman, she yells at me, verbally offends and humiliates me in front of other colleagues, intimidating me that she will call on me Ms. Jennifer Amorin from CPAC (human resources).

32. On April 17, 2012, overwhelmed with the constant abuse, I open an EEO case of reprisal and discrimination based on National Origin (EEOC No. 480-2013-00138X; Agency No. ARPOM12April01562).

33. On May 1st, Ms. Kaufman and Ms. Sahie Kang hand me a Letter of Non-Renewal, alleging "lack of work". I immediately go online to see if there are any job posts, and I apply to various internal and external advertisements within DLIFLC. Between the period May 1st and May 9th, 2012, seeing that there were several openings and Calls for Candidates in various DLIFLC's programs, I met with the deans Mr. Steven Collins, Mr. Michael Vezilich, and Ms. Deanna Tovar trying to get a transfer and find a position within their Departments. Yet, all the contacted deans told me that they had no open position for me, although the positions were active and unfilled. It was clear that, although I have a Ph.D. in teaching Spanish language, literature, and culture, they did not want to give me a job because they had been instructed not to do so.

34. On or around May 3th, 2012, through Associate Provost Mr. Steven Collins, I requested a meeting with Ms. Betty Leaver who refused to see me, alleging that the meeting would not be productive.

35. Then, I reached out to the Provost, Dr. Donald Fischer requesting a meeting. Dr. Fischer alleges lack of time, then traveling and passes the issue to his replacement Mr. Jielu Zhao who informed me that the office of the Provost cannot deal with my issue.

36. Subsequently, I requested a meeting with Commandant Colonel Pick, and the Commandant's administrative assistant referred me to the Assistant Commandant, Colonel Ryan. At the meeting, Colonel Ryan is accompanied by CPAC representative, Ms. Jennifer Amorin and both state "lack of work". Following the chain of command, I asked for permission to meet with Commandant Colonel Pick. Yet, Colonel Ryan refused to give me permission to meet with the Commandant Colonel Pick.

37. On May 16, 2012, -six days after my termination- Associate Provost Mr. Jielu Zhao sends Mr. Samir A. Sallam a letter of Suspension from Duty where Mr. Sallam is suspended for 5 days no pay, and removed from any managerial duties at DLIFLC due to the behavior Mr. Sallam showed with Complainant and Complainant's spouse; among others, the report states "you [Sallam] conducted yourself unprofessionally and caused a demoralizing situation for at least two of your subordinates in a public setting. Making unwelcomed physical contact with employees and discussing individual performance deficiencies in a group setting are offensive acts that discredit your inability to be an effective manager".

38. In April 2014, the EEOC hearing is held for two day, and the decision is given on September 28, 2018.

39. I appealed the case (Appeal No. 2019001281), and on January 14, 2020 the Office of Federal Operations mailed a letter to inform me that I had the right to file a Civil Action.

40. My wife's EEOC went to trial twice, and in both instances DLIFLC negotiated to settle the case under confidencial terms (a case of sexual harassment, discrimination, retaliation, and hostile work environment).